UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CIV 5384

Judge Pauley



| | |
|---|---|
| HDL INVESTMENTS, LLC, | ) |
| Plaintiff, | ) |
| v. | ) |
| CITIGROUP ALTERNATIVE INVESTMENTS LLC, CORPORATE SPECIAL OPPORTUNITIES LTD., CSO PARTNERS LTD, CSO US LTD., and CSO LTD., | ) **COMPLAINT** ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) |

Plaintiff HDL Investments, LLC ("HDL") by its attorneys Liddle & Robinson L.L.P. alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff, an investor in hedge funds, CSO US Ltd. and CSO Ltd. (together "CSO" or "the Fund"), sponsored by Citigroup Alternative Investments L.L.C. ("CAI") and managed by CSO Partners Ltd. ("CPL"), a wholly-owned CAI subsidiary, brings this action to recover the loss of his investment of half a million dollars ($500,000). Plaintiff, a long-standing client of Citi Private Bank, invested in the hedge funds presented and sold to him by his private banker. The offering documents and placement materials presented the Fund as a conservative investment vehicle that employed a strategy of value investing, fundamental analysis, trade scaling, and low volatility. These offering documents and placement materials also stated that CSO had an enhanced framework to

identify, value, and hedge trades, and that it had a solid business infrastructure with independent risk oversight, compliance, and dedicated legal counsel. These offering documents and placement materials did not disclose that the Fund would employ leverage as an investment strategy and that trades would neither be scaled, nor hedged. As a result of a disastrous trade in the debt of ProSiebenSat1 Media AG ("ProSieben"), it was revealed in December 2007 that the leverage of the Fund was 7.5 times the net asset value of the Fund and that the Fund's investments were completely unhedged. This trade also revealed that trade scaling was not being employed; in fact, the ProSieben trade was 1.5 times the net asset value of the Fund. In addition, the ProSieben trade revealed that the Fund did not have a solid business structure in that a) the trade was done in the first place and b) that it was kept off the balance sheet of the Fund for six months and hidden from investors, through several redemption periods. Plaintiff seeks the return of its investment because the offering documents and informational materials provided to Plaintiff misrepresented the investment strategy and the infrastructure of the Fund.

## THE PARTIES

2. Plaintiff HDL is a limited liability company organized under Delaware law with its principal place of business in the city of Princeton, New Jersey. HDL is family investment vehicle. John Slapp ("Slapp" or "Mr. Slapp") is the managing member of HDL.

3. Defendant CAI is a Delaware limited liability company with its principal place of business at 731 Lexington Avenue, New York, New York. CAI is an indirect wholly-owned subsidiary of Citigroup, Inc.

4. Defendant Corporate Special Opportunities Ltd. ("the Master Fund") is an exempted limited liability company, organized under Cayman laws on February 6, 2004. It is licensed as a mutual fund by the Cayman Islands Monetary Authority. The Master Fund is the investment vehicle of Citigroup's Corporate Special Opportunities investment business unit.

5. Defendant CPL is a limited liability company organized under English law with its principal place of business in London. CPL is the investment manager of the Master Fund and is registered as an investment advisor with the Securities and Exchange Commission and the U.K. Financial Services Authority. CPL is a wholly-owned subsidiary of CAI and indirectly of Citigroup, Inc. In its literature, CAI describes CPL as part of the CSO Opportunities Group, an integral part of CAI.

6. Defendant CSO US Ltd. ("CSO US") is an exempted limited liability company organized under the laws of the Cayman Islands and is a registered mutual fund with the Cayman Island Monetary Authority. CSO US is a feeder fund for the Master Fund and markets its services to U.S. taxable investors and certain non-U.S. investors. CPL is the investment manager for CSO US.

7. Defendant CSO Ltd. ("CSO Ltd.") is an exempted limited liability company organized under the laws of the Cayman Islands and is a registered mutual fund with the Cayman Island Monetary Authority. CSO Ltd. Serves as a feeder fund for the Master Fund. CPL is the investment manager for CSO Ltd.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1392 because a substantial part of the events giving rise to the claim occurred in this District and because CAI is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.  CSO's Business

10. CSO is part of Corporate Special Opportunities, a Citigroup investment business established in 1999 to manage Citigroup's proprietary capital in investment markets. In 2004, CSO was created so that Citigroup's customers could invest with Citigroup in a common investment vehicle under the auspices of Corporate Special Opportunities. CSO is one of the 16 investment centers within CAI.

11. CSO's stated investment strategy is to invest principally in stressed, distressed and special situations debt obligations as well as investment grade debt and equity of corporate issuers predominately in the United States, the United Kingdom, and the European Union.

12. CSO financed its investment strategy though credit facilities or total return swaps with J.P. Morgan Chase and Dresdner Bank. The ability to finance the transactions enabled CSO to leverage its investments. Upon information and belief, CAI set internal limits on CSO leverage. CSO, however, did not disclose to investors that leverage was being used an investment strategy.

13. When CSO was opened to the public in August 2004, Citigroup invested fifty million dollars in CSO Citigroup Ltd., a feeder fund for the Master Fund, and an additional forty million dollars in CSO US. Upon information and belief, Citigroup owns approximately twenty percent of the Master Fund. Citigroup's wealth management division holds thirty five percent of the Master Fund on behalf of its private clients. Forty percent of the Master Fund is owned by institutional investors. Employees of CPL own approximately five percent of the Master Fund.

14. CPL charges CSO US and CSO Ltd. monthly investment fees equal to 1/12 of two percent of the net assets under management and performance fees equal to twenty percent of the appreciation in the value of the shares during the period quarter as calculated in accordance with the PPMs. The Master Fund pays no investment or performance fees to CPL. In addition Citibank received a 3% placement fee (commission) for selling the CSO fund to HDL.

15. John Pickett was the chief executive officer of CPL and portfolio manager of the Master Fund. The Private Placement Memoranda ("PPM") designates Pickett as a key man and provides for special redemption policies if Pickett leaves CPL's employ or is incapacitated. Pickett resigned from CPL on or about December 12, 2007. According to a July 28, 2008 Wall Street Journal article, he has sued Citigroup alleging that top Citigroup executives caved in to the demands of investment banks in the loan deal, ignoring the financial interests of CSO's investors.

**B.    Plaintiff Invests in the CSO Funds**

16. HDL, a client of Citigroup's Private Bank, invested $500,000 in CSO on April 1, 2007.

17. Mr. Slapp, the managing member of HDL, is a sophisticated investor who has invested in other Citi hedge funds with mixed results and is fully aware of the risks associated with such investments. Mr. Slapp was not able to fully evaluate the risks associated with investing in CSO because those risks were not properly disclosed.

18. HDL invested in CSO based on the investment strategy presented in CSO's offering documents and the sales literature.

19. The sales literature, a 29 page booklet, entitled "Corporate Special Opportunities," represented that CSO has "a value-oriented investment style with a macro overlay to a broad investment universe" and that from its inception in August 2004 through September 2006, CSO's net annualized return was 13.3% with volatility of only 4.3%. The literature also stated that "John Pickett, CSO's Managing Director, has 19 years investment experience in corporates, which spans virtually every economic, market and credit cycle and crisis since these markets became a credible asset class." One of the Fund's "Competitive Advantage[s]" was described as its "[e]nhanced framework to identify, value, size and hedge trades." This portrayed a well managed, conservative fixed income fund.

20. The Investment Strategy – Overview stated that CSO's investment goals are "to capture high returns with a low degree of volatility, market correlation and draw downs." There are eight bullet points detailing CSO's investment strategy with no mention of the use of leverage.

21. Because low volatility was a priority for the Fund and because leverage was not explicitly listed as an investment strategy (as it had been in the marketing

documents for other Citi hedge funds), Plaintiff understood that leverage would not be employed as a strategy in CSO's investments.

22. The background materials provided to Plaintiff included a section titled "Investment Strategy – Portfolio Construction Process." This sections contained the following bullet points, among others:

- Size positions as a function of associated downside risk.

- Impose portfolio-based risk constraints.

- Trade scaling: CSO will typically take a small initial position, adding over time after developing a more detailed understanding of the investment.

There was no mention of the use of leverage.

23. Those materials also included a section titled "Investment Strategy – Risk Management Measures." This section contained the following bullet points:

Portfolio Constraints, Guidelines and Restrictions:

- Issuer concentration limited to 20% of Gross Exposure.

- Industry concentration limited to 30% of Gross Exposure.

- Equity concentration limited to 30% of Gross Exposure.

- Unhedged FX exposure vs. $US limited to 15% of net asset value.

Again, leverage is not mentioned.

24. On page five of the same booklet, there is a "Profile" of the fund that does not mention the use of leverage.

25. The booklet also contained a section, entitled "CSO Organization – Solid Business Infrastructure." This section mentions that the business infrastructure includes among other provisions:

- Independent Risk Oversight: CAI Head of Risk Management monitors portfolio risk parameters on an ongoing basis;

- Compliance: CAI European Compliance Officer monitors fiduciary and regulatory matters. The CSO Fiduciary Committee has additional oversight responsibility;

- Legal Counsel: CSO has dedicated in-house legal counsel and external counsel in the U.K., the Cayman Islands, and other jurisdictions.

26. The PPM contained very similar language. On pages 14, 15, and 16 the Investment Objective and Strategy of the Master Company are described in detail, including the Fund's fundamental credit analysis, exit strategies, strategies to minimize losses, and controlling interests. There is no mention of the use of leverage by the Fund, which is easily the most important factor influencing the performance of the Fund. In particular, on page 16 of the PPM, it was represented that the "principal strategy for avoiding losses is to rely on a consistent and disciplined investment process." On the same page, the PPM stated with regard to "Scaling Positions" that "[i]n a similar fashion, the Investment Manager typically increases the size of its investment in a corporation's obligations over time as it gains a better understanding of the underlying financial condition of the corporation and the manner in which its obligations trade in the market."

27. Pages 17 and 18 of the PPM contain the concentration restrictions, which are the same those described in paragraph 24.

28. The PPM states in boilerplate language on page 64, that [t]here is no maximum permitted leverage to which the Master Company is subject. However, the Citigroup's internal risk management function is involved in the monitoring of the

8

<u>Investment Manager's investment activities to help determine that they are consistent with the investment restrictions set forth in the Master Investment Management Agreement.</u>"

29.    Plaintiff relied on the representations and would not have invested in the Fund if he knew that the purported investment strategy would not be followed and that internal controls would fail.

**C.    The ProSieben Investment**

30.    Upon information and belief, in or about May 2007, Pickett sent a binding Indication of Interest by fax to the Managing Lead Arrangers ("MLAs") of a syndicated loan to ProSieben, offering to purchase €512 million of a €7.2 billion loan.

31.    Upon information and belief, Pickett did not enter the trade in a pipeline report showing the timing and amount of the transactions in process and investments on the books that would be maturing, sold or disposed of otherwise.

32.    Upon information and belief, the MLAs of the ProSieben loan promptly sent a confirmation of the Indication of Interest to CPL. Upon information and belief, the back office of CPL and the risk managers of CAI failed to record the confirmation as a result of a lack of internal controls.

33.    Upon information and belief, the ProSieben order exceeded Citigroup's internal trading limits on leverage of six times net asset value.

34.    Upon information and belief, the MLAs allocated €512 million of debt to CSO and notified CPL of this allocation on June 29, 2007. Upon information and belief, this development was not recorded on the books and records of CSO.

9

35. Upon information and belief, Pickett unilaterally refused to honor the allocation notice because allegedly the MLAs had materially changed the terms of the transaction.

36. Upon information and belief, the MLAs complained to John Havens, president and CEO of CAI since April 2007, about Pickett's attempted withdrawal from the transaction.

37. Upon information and belief, from mid-summer 2007 to early December 2007, Defendants secretly negotiated with the MLAs to settle the dispute over the ProSieben investment. Citigroup did not notify CSO investors of the existence of the dispute or include the transaction in the financial and risk assessment reports distributed to plaintiff.

38. Upon information and belief, the CSO exposure report as of October 31, 2007 omitted the ProSieben investment and falsely represented that leverage declined to 5.36 times net asset value. HDL did not receive a copy of this report, but upon information and belief, other investors did.

**D.    Investors Learn of the ProSieben Investment**

39. On December 14, 2007, CSO sent a letter to all of its investors notifying them that the Master Fund "has been involved in a dispute with Managing Lead Arrangers (MLAs) in connection with a syndicated loan. . . . The settlement will result in the CSO fund purchasing loans with an aggregate principal amount of €512 million. . . . Based on the mark-to-market value of the loans as of November 30, 2007, the CSO fund will take a reserve of US$ 62.4 million resulting in a net asset value of US$548 million."

40. The same letter also notified CSO investors that the "CSO fund is down 12.6% on a gross basis. Of this decline in value, 10% is attributable to the reserve and 2.6% represents the gross portfolio loss in November 2007." The letter also stated that "the quality of the CSO funds portfolio is fundamentally sound," that Citibank is willing to increase its investment by a further $50 million subject to tax issues, and that it is waving fees until November 2008. This statement was misleading because it did not include any mention of leverage. A fundamentally sound investment has a different risk profile when it is leveraged 7 times.

41. Additionally, the December 14, 2007 letter notified investors that Pickett had resigned.

42. At no point from the time that Pickett expressed interest in participating in the ProSieben transaction, were CSO investors notified of this potential investment, which implicated more than one and a half times the net asset value of the Fund.

43. On December 17, 2007, Mr. Slapp contacted Sarah O'Brien ("O'Brien"), the private banker at the Citigroup Private Bank who had introduced him to the CSO funds. Mr. Slapp wanted to know the details of the syndicated loan, including why investors had <u>not</u> been notified until December 14, 2007 about the existence of the loan. Mr. Slapp also inquired into when the purchase happened, how could a fund with a net asset value of about $500 million purchase a loan so large, and how leveraged is this fund.

44. On December 19, 2007, the shareholders of CSO were notified that Pickett's resignation had triggered a "Key Man Event" and that shareholders had the option of redeeming shares categorized as "KME Redemption Shares."

45. Also, on December 19, 2007, Mr. Slapp had a telephone conference with Ramesh Parameswar, a CAI investment relations officer located in New York. Parameswar was not able to explain why the transaction had been kept off the books until December 2007, or why investors had not been notified of the transaction until December 14, 2007. Mr. Slapp learned that ProSieben transaction had increased the leverage of the fund from 5.4 to 6.9 and that the trade had been the subject of a legal dispute since the end of June 2007. He also was told that approximately $40 million in redemptions were made before the ProSieben trade was disclosed to the investors.

46. Mr. Slapp was very surprised to learn that the leverage of the Fund before the ProSieben transaction was 5.4 and that the fund was unhedged.

47. Following his conversation with Parameswar, on December 20, 2009, Slapp sent an e-mail to O'Brien, asking her to forward some follow up questions to Parameswar. Mr. Slapp did not receive a satisfactory response.

48. On January 3, 2008, Slapp sent a letter to O'Brien requesting a refund of his investment amount.

49. On January 23, 2008, the CSO issued a performance report that for the first time named the top positions held by the Fund and indicated its leverage. The report indicated that the top seven positions totaled 3.5 times the Net Asset Value of the Fund, that the Fund was un-hedged and that its leverage was 7.58.

50. On January 25, 2008, all CSO investors were notified by letter that "redemptions of all shares have been temporarily suspended until such time as the boards resolve otherwise." The letter also noted that "[w]hile the Investment Manager continues to believe in the inherently good quality of the Master Fund's assets, a forced liquidation

of the assets coupled with a general lack of activity in the credit markets would result in sale prices not reflective of the assets' true value. . . . The Investment Manager has also been working on a plan to restructure the Master Fund's financing and capitalization to position the fund as best as possible for future growth."

51. On January 31, 2008, CSO investors were sent another letter, which notified them that "[a]t the end of day January 31st 2008, the CSO master fund was down 31% MTD on a gross basis. This reflects the performance of the fund and the adjustment to the reserve for the settlement of a syndicated loan trade dispute. We continue to have strong faith in the quality of our underlying positions despite these painful mark-to-market price moves."

52. A February 15, 2008 Wall Street Journal article described the situation as follows:

> Mr. Pickett's big order last June was for several hundred million dollars of leveraged loans that a group of banks was selling in a private auction on behalf of a German media company. . . . At the time, CSO had roughly $700 million in assets, meaning that Mr. Pickett wanted to commit more than half of the hedge fund's assets. . . .
>
> The seven banks running the June auction allocated CSO a bundle of loans with a price tag of more than €500 million ($730 million), say the people involved in the transaction. Mr. Pickett tried to back out, saying the banks in the deal changed the loan terms after he submitted this bid. . . .
>
> Mr. Pickett argued that it was his fiduciary duty to cancel the order. He proposed to Citigroup executives that the fund sue the banks arranging the transaction.
>
> Executives at Morgan Stanley, a lead bank on the loan deal, cried foul. They called Mr. Havens, who was Mr. Pickett's superior and former head of global sale and distribution at Morgan Stanley.
>
> . . . [Mr. Havens] began trying to negotiate a settlement with Morgan Stanley over the deal.

> Mr. Pickett responded by accusing Messrs. Havens and O'Brien of ignoring the fund's fiduciary duty and having a potential conflict of interest given their ties to Morgan Stanley. . . .
>
> In early December, Citigroup executives agreed to a settlement proposed by Morgan Stanley. Under the deal, CSO would purchase €512 million (about $746 million) of the loans at face value, even though they were trading for 86% to 93% of their face value. . . .
>
> Had it not purchased the loans and paid the legal costs, CSO would have reported a modest positive return for 2007 – not a 10.9% loss.

53. On February 21, 2008, investors in CSO were notified that Citigroup intended to restructure CSO. The restructuring was targeted to allow the Master Fund to: "(i) sell off a substantial portion of its current portfolio to Citigroup, thereby reducing the fund's leverage and allowing the return of collateral posted by the fund to meet obligations under a financing line with its largest financing counterparty; (ii) finance the acquisition by the fund of approximately 65 % of the ProSieben assets that were the subject of a now-settled trade dispute, with Citigroup buying the rest; and (iii) provide liquidity to the fund to help meet ongoing collateral obligations under its financing lines."

54. The February 21, 2008 letter noted that "[t]he Investment Manager believes that is imperative to address the Master Fund's high leverage, which has resulted from recent and unprecedented market dislocation and weakness, as well as the incremental exposure created by the pending settlement of the ProSieben loan positions.

55. The restructuring described in the February 21, 2008 letter was intended to have the following consequences:

> - The Master Fund's leverage is expected to come down to a targeted leverage in the range of 4.5x, based on market prices as of February 8, 2008.

- Following implementation of the restructuring plan, it is expected that no single position held by the Master Fund will represent more that [sic] 15% gross exposure.

- We believe that the overall next asset value of the Master Fund as of February 8, 2008 market prices, assuming the elements of the restructuring plan had been implemented as of that date and all other things remaining equal, would have been $574 million.

- As of February 1, 2008, the fund's management fees have been lowered by 1% to all investors for the Master Fund's fiscal year 2008, and incentive fees have also been waived for the fiscal year 2008 as of that date.

56. Citigroup would not have undertaken such drastic measures, had it not known that its internal controls has failed, that CSO's investment strategy had not been followed, and had it not acknowledged the fact that the ProSieben transaction had a material negative effect on the financial condition of CSO.

57. But for the fall out of the ProSieben transaction, CSO investors would not have learned that the actual financial condition of the Fund and the fact that it was unhedged and so highly leveraged.

58. On November 18, 2008, CSO investors were informed that a forced redemption would occur on November 20, 2008 "for cash at a per share price equal to the net asset value per share to be determined by the fund's administrator as of the Redemption Date."

59. CSO investors received $0.03 for each dollar invested.

60. HDL recovered $14,922.77 of the $500,000.00 it invested on April 1, 2007.

## COUNT I

### Breach of Fiduciary Duty

61. Plaintiff incorporates the allegations set forth in Paragraphs 1 through 60 above as if fully set forth herein.

62. Defendants stood in a fiduciary relationship with Plaintiff by virtue of their position and by virtue of having superior access to confidential information so as to require Plaintiff to repose trust and confidence in them. The fiduciary relationship arose from plaintiff entrusting assets to Defendants for investment.

63. All decision making associated with CSO was given to Defendants' discretion and direction.

64. Defendants owed a fiduciary duty to Plaintiff as an investor in CSO to invest strictly in accordance with the investment strategy set forth in the PPMs and internal trading guidelines.

65. Defendants owed a fiduciary duty to Plaintiff as an investor in CSO to make full, timely and complete disclosures of all material investments and other actions taken on behalf of CSO. CPL owed Plaintiff a fiduciary duty of truthfulness and candor as a registered investment advisor in the United States and in the United Kingdom. Defendants breached this duty by failing to make timely disclosure of the fact that the Fund was highly leveraged, unhedged and that the trading strategy was not being followed.

66. Defendants betrayed their fiduciary duties in connection with the ProSieben investment because that investment violated defendants' own trading limits and policies.

67. CAI further owed plaintiff a fiduciary duty to exercise vigilance to ensure that CPL and Pickett invested in accordance with applicable trading limits and practices.

68. Plaintiff suffered damages in an amount to be determined at trial as a direct result of defendants' breach of fiduciary duties owed to plaintiff. But for the breach of fiduciary duty by CPL and CAI, plaintiff would not have lost the entirety of its investment.

## COUNT II

### Professional Negligence

69. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 68 above as if fully set forth herein.

70. Defendants owed plaintiff a duty of care to monitor the activities of John Pickett and to ensure that all trades were executed in compliance with internal trading limits, the trading strategy and objectives detailed in the marketing documents and the PPO, and industry standards.

71. Defendants breached their duty of care to monitor adequately the activities of John Pickett as portfolio manager of CSO and by failing to have systems in place to capture all intentions of interest, commitments, subscriptions, trades, credit transactions, and all communications with counterparties on the books and record of CSO and CAI. Defendants also failed to ensure that all trades were executed in compliance with trading limits. Defendants' failures were a departure from accepted standards of practice in the industry.

72. Plaintiff has been damaged as a proximate result of defendants' negligence in an amount to be determined at trial. But for defendants' negligence, plaintiff would not have lost the entirety of its investment.

## COUNT III

### Fraud

73. Plaintiff incorporates the allegations set forth in Paragraphs 1 through 72 above as if fully set forth herein.

74. Defendants failed to disclose that leverage would be used as an investment strategy for the Fund.

75. Defendants knew that the ProSieben transaction, which increased the leverage of the Fund to 6.9 times the net asset value of the Fund, violated the internal trading limits set by CAI and CSO's PPMs.

76. Defendants chose to go ahead with the ProSieben transaction even though Pickett, the portfolio manager, decided that it was not a good investment.

77. Defendants failed to record the ProSieben transaction on the Fund's books and records, thereby concealing the existence of the transaction from investors in the Fund.

78. Defendants provided portfolio risk assessments to Plaintiff that did not disclose that because of the ProSieben investment, the Fund's leverage was up to seven times the net asset value of the Fund.

79. Defendants' use of leverage, lack of hedging, general failure to follow its own investment guidelines, and undisclosed investment in ProSieben resulted in the ultimate collapse of the Fund and caused plaintiff to lose the entirety of its investment.

80. As a result of its reliance on defendants' fraudulent misrepresentations and omissions, plaintiff has suffered damages in an amount to be determined at trial.

## Count IV

## Breach of Contract

81. Plaintiff incorporates the allegations set forth in Paragraphs 1 through 80 above as if fully set forth herein.

82. Plaintiff contracted with Defendants that in return for the payment of certain fees, Defendants would invest Plaintiff's money in accordance with the investment strategy set out in the background materials and PPM provided to plaintiff.

83. Defendants breached their promise to follow a specified investment strategy and implement certain risk management measures in making investment decisions for CSO.

84. Defendants violated internal trading limits, allowed the leverage of the Fund to increase to a dangerous level, failed to disclose the effect of the ProSieben transaction to investors, and failed to put in place measures to counteract the effect of the excessive leverage on the Fund.

85. As a result of Defendants' breach, Plaintiff lost the entirety of its investment.

## CONCLUSION

WHEREFORE, plaintiffs demand judgment from this Court awarding:

(a)   On Counts I, II, III and IV, compensatory damages against all defendants in an amount not less $500,000 to be determined at trial;

(b)   Pre-judgment interest in the amount recoverable under New York law;

(c)   Such other and further relief as shall be appropriate.

Dated: June 10, 2009
       New York, New York

                      Respectfully submitted,

                      LIDDLE & ROBINSON, L.L.P.

                      By: _____
                           Jeffrey L. Liddle
                           Ethan A. Brecher
                           Maryana A. Kodner

                      800 Third Avenue
                      New York, NY 10017
                      (212) 687-8500
                      *Attorneys for Plaintiff*