

RECEIVED
OCT 23 2009
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| HDL INVESTMENTS, LLC, | ) |
| Plaintiff, | ) 09 Civ. 5384 (WHP) |
| | ) ECF CASE |
| v. | ) |
| CITIGROUP ALTERNATIVE INVESTMENTS | ) **FIRST AMENDED COMPLAINT** |
| LLC, CORPORATE SPECIAL OPPORTUNITIES | ) |
| LTD., CSO PARTNERS LTD, and CSO US LTD., | ) **JURY TRIAL DEMANDED** |
| and CSO LTD., | ) |
| Defendants. | ) |

Plaintiff HDL Investments, LLC ("HDL"), by its attorneys Liddle & Robinson L.L.P., alleges for its First Amended Complaint as follows:

1.     By this action, Plaintiff HDL seeks to recover the loss of its investment in hedge funds known as Corporate Special Opportunities Ltd. and CSO US Ltd. (collectively "the Fund"), which were sponsored by Citigroup Alternative Investments LLC ("CAI") and managed by CSO Partners Ltd. ("CPL"), a wholly-owned CAI subsidiary.

## THE PARTIES

2.     Plaintiff HDL is a limited liability company organized under Delaware law with its principal place of business in Princeton, New Jersey.

3.     HDL is family investment vehicle managed by John Slapp ("Slapp" or "Mr. Slapp").

4.     Defendant Citigroup Alternative Investments LLC ("CAI') is a Delaware limited liability company with its principal place of business at 731 Lexington Avenue, New York, New York. CAI is an integrated alternative investment platform that manages a wide range of products across five asset classes, including private equity, hedge funds, real estate, fixed income investment management and infrastructure. CAI manages capital on behalf of its parent, Citigroup, Inc. ("Citigroup"), as well as institutional and high net worth investors.

5.     Defendant Corporate Special Opportunities Ltd. ("the Master Fund") is an exempted limited liability company, organized under Cayman laws on February 6, 2004. It is licensed as a mutual fund by the Cayman Islands Monetary Authority. The Master Fund is a single manager hedge fund investing in the credit and distressed sectors, with a focus on credit-oriented and event driven strategies.

6.     Defendant CSO Partners Ltd. ("CPL") is a limited liability company organized under English law with its principal place of business in London, England. CPL is a 100% owned subsidiary of CAI. CPL was established in 1999 to invest Citigroup's proprietary capital within the corporate debt markets across all asset classes. CPL is also the investment manager of the Master Fund and is registered as an investment advisor with the U.S. Securities and Exchange Commission and the U.K. Financial Services Authority.

7.     Defendant CSO US Ltd. ("CSO US") is an exempted limited liability company organized under the laws of the Cayman Islands and is a registered mutual fund with the Cayman Island Monetary Authority. CSO US is a feeder fund for the Master Fund and markets its services to U.S. taxable investors and certain non-U.S. investors.

2

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1392 because a substantial part of the events giving rise to the claim occurred in this District and because CAI is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A.    The Fund's Business

10.    The Fund is part of Corporate Special Opportunities, a CAI investment business established in 1999 to manage Citigroup's proprietary capital in investment markets.  In 2004, the Fund was created so that Citigroup's customers could invest with Citigroup in a common investment vehicle under the auspices of Corporate Special Opportunities.  The Fund is one of the 16 investment centers within CAI

11.    The Fund's stated investment strategy is to invest principally in stressed, distressed and special situations debt obligations, as well as investment grade debt and equity of corporate issuers predominately in the United States, the United Kingdom, and the European Union.

12.    The Fund financed its investment strategy though credit facilities or total return swaps with J.P. Morgan Chase and Dresdner Bank.  The ability to finance the transactions enabled the Fund to leverage its investments.  Upon information and belief, CAI set internal limits on the Fund's use of leverage.  It was never disclosed to Plaintiff that leverage would be used as a primary investment strategy.

13.     When the Fund was opened to the public in August 2004, Citigroup invested fifty million dollars ($50 million) in CSO Citigroup Ltd., a feeder fund for the Master Fund, and an additional forty million dollars ($40 million) in CSO US.  Upon information and belief, Citigroup owns approximately twenty percent of the Master Fund; Citigroup's wealth management division holds thirty five percent of the Master Fund on behalf of its private clients; forty percent of the Master Fund is owned by institutional investors; and employees of CPL own approximately five percent of the Master Fund.

14.     CPL charges CSO US a monthly investment fee equal to 1/12 of two percent of the net assets under management and performance fees equal to twenty percent of the appreciation in the value of the shares during the period quarter as calculated in accordance with the October 2006 Private Placement Memorandum ("PPM") for CSO US.  The Master Fund pays no investment or performance fees to CPL.  In addition HDL paid a 3% placement fee for investing in the Fund.

15.     John Pickett ("Pickett") served as the chief executive officer of CPL and portfolio manager of the Fund.  The PPM designates Pickett as a "key man" and provides for special redemption policies if Pickett were to leave CPL's employ or became incapacitated.  Pickett resigned from CPL on or about December 12, 2007 after it was disclosed that he had made an investment decision to leverage the Fund's assets by 2-3 times in order to buy a €512 million interest in a €7.2 billion debt offering issued by ProSiebenSat 1 Media AG ("ProSieben"), a German media company.

## B. CPL and the Fund Are CAI's Alter Egos and Instrumentalities

16. Upon information and belief, CPL and the Fund were the alter egos and/or instrumentalities of CAI at all times relevant to this action. CAI had the right to control and did control the Fund's investment strategy at all times.

17. The marketing materials for the Fund represented that "CAI Head of Risk Management monitors portfolio risk parameters on an ongoing basis" and that "CAI European Compliance Officer monitors fiduciary and regulatory matters. The CSO Fiduciary Committee has additional oversight responsibility." Plaintiff relied on these representations in making the decision to invest and remain invested in the Fund.

18. A "Citigroup Company" owns non-redeemable Founder Shares in the CSO companies with preferential voting rights. In the event CPL were to give notice of termination of the Investment Management Agreement with the Master Fund for any reason, including the departure of Pickett, a "Citigroup Company" has the voting power to pass a resolution to wind up the fund in question. As the parent company of CPL, CAI has the power to dictate whether and when CPL could terminate the Investment Management Agreement.

19. The directors of the Master Fund are also directors of CSO Ltd. (a feeder fund to the Master Fund for offshore investors), CSO Citigroup Ltd. (another feeder fund) and CSO US Ltd. Scott Somerville, Paola Lazzarotto and Dwight Dubé are employees of Maples Finance Limited and nominal directors of the Fund appointed by CAI. Upon information and belief, they play no meaningful role in the day to day oversight or direction of the Fund.

## C.    Plaintiff Invests in the Fund

20.     HDL, a client of Citigroup's Private Bank, invested $500,000 in shares of CSO US on April 1, 2007, by signing a subscription agreement with CSO US, which incorporated the terms of the PPM.  The subscription agreement, which contains a New York choice of law provision, constituted a contract between HDL and CSO US.  According to the PPM, CSO US was organized as a feeder fund to invest in the shares of the Master Fund, and HDL thus became a shareholder of the Master Fund.

21.     The PPM specified that "[s]ince the Master [Fund] "pursues the same investment objective as that of [CSO US Ltd.], [CSO US Ltd.] uses the subscription proceeds received on the issue of Shares entirely to subscribe for Master [Fund] Shares. . . ."

22.     Mr. Slapp, the managing member of HDL, is a sophisticated investor who has invested in other Citigroup hedge funds with mixed results and is fully aware of the risks associated with such investments.

23.     HDL invested in the Fund based on the investment strategy presented in the PPM and in the accompanying sales literature provided to him by Citigroup.  The sales literature did not make a distinction between CSO US Ltd. and the Master Fund.

24.     The sales literature, which included a 29 page booklet, entitled "Corporate Special Opportunities," (the "Booklet") represented that the Fund has "a value-oriented investment style with a macro overlay to a broad investment universe" and that from its inception in August 2004 through September 2006, the Fund's net annualized return was 13.3% with volatility of only 4.3%.  The Booklet also stated that "John Pickett, [the Fund's] Managing Director, has 19 years investment experience in corporates, which spans virtually every economic, market and credit cycle and crisis since these markets became a credible asset class."  One of the Fund's

"Competitive Advantage[s]" was described as its "[e]nhanced framework to identify, value, size and hedge trades." This portrayed a well managed, conservative fixed income fund.

25.     The Investment Strategy – Overview section of the Booklet stated that the Fund's investment goals are "to capture high returns with a low degree of volatility, market correlation and draw downs." There are eight bullet points detailing the Fund's investment strategy with no mention of the use of leverage.

26.     Because low volatility was a priority for the Fund and because leverage was not explicitly listed as an investment strategy (as it had been in the marketing documents for other Citigroup hedge funds in which HDL had invested), HDL understood that leverage would not be employed as a primary strategy in the Fund's investments.

27.     The Booklet included a section titled "Investment Strategy – Portfolio Construction Process." This section contained the following bullet points, among others:

-   Size positions as a function of associated downside risk.

-   Impose portfolio-based risk constraints.

-   Trade scaling: [the Fund] will typically take a small initial position, adding over time after developing a more detailed understanding of the investment.

There was no mention of the use of leverage in this section.

28.     The Booklet also included a section titled "Investment Strategy – Risk Management Measures." This section contained the following bullet points:

Portfolio Constraints, Guidelines and Restrictions:

-   Issuer concentration limited to 20% of Gross Exposure.

-   Industry concentration limited to 30% of Gross Exposure.

-   Equity concentration limited to 30% of Gross Exposure.

-   Unhedged FX exposure vs. $US limited to 15% of net asset value.

Again, leverage is not mentioned in this section.

29. On page five of the Booklet, there is a "Profile" of the Fund that does not mention the use of leverage.

30. The Booklet also contained a section, titled "CSO Organization -- Solid Business Infrastructure." This section details that the business infrastructure includes among other provisions:

- Investment Manager: The [CPL] investment team is part of [CAI] and reports to the Head of Liquid Investments at CAI;

- Independent Risk Oversight: CAI Head of Risk Management monitors portfolio risk parameters on an ongoing basis;

- Compliance: CAI European Compliance Officer monitors fiduciary and regulatory matters. The CSO Fiduciary Committee has additional oversight responsibility;

- Legal Counsel: CSO has dedicated in-house legal counsel and external counsel in the U.K., the Cayman Islands, and other jurisdictions.

31. The only mention of "leverage" in the Booklet is on page 21, in a section titled "Risk Considerations," which states: "Leverage creates the opportunity for higher returns, but increases the risks of losses. Leverage will result in higher volatility in the Fund's net asset value." Because the Booklet provided that the Fund's stated "Investment Strategy" was to "capture returns with a low degree of volatility," the inclusion of the definition of "Leverage" in the Risk Considerations section of the Booklet did not constitute a disclosure that the use of leverage was part of the Fund's overall investment strategy.

32.     The PPM contained very similar language to that contained in the Booklet.  On pages 14, 15, and 16 the Investment Objective and Strategy of the Fund are described in detail, including the Fund's fundamental credit analysis, exit strategies, strategies to minimize losses, and controlling interests.  There is no mention of the use of leverage by the Fund.  In particular, on page 16 of the PPM, it was represented that the "principal strategy for avoiding losses is to rely on a consistent and disciplined investment process."  On the same page, the PPM stated with regard to "Scaling Positions" that "[i]n a similar fashion, the Investment Manager typically increases the size of its investment in a corporation's obligations over time as it gains a better understanding of the underlying financial condition of the corporation and the manner in which its obligations trade in the market."

33.     Pages 17 and 18 of the PPM contain the concentration restrictions, which are the same those described in paragraph 28.

34.     The PPM states in boilerplate language on page 64, that [t]here is no maximum permitted leverage to which the Master Company is subject.  However, the Citigroup's internal risk management function is involved in the monitoring of the Investment Manager's investment activities to help determine that they are consistent with the investment restrictions set forth in the Master Investment Management Agreement."

35.     Plaintiff relied on these representations and would not have invested in the Fund if he knew that the purported investment strategy would not be followed and that internal controls would fail.

## D.     The ProSieben Investment

36.     Upon information and belief, in or about May 2007, Pickett sent a binding Indication of Interest by fax to the Managing Lead Arrangers ("MLAs") of a syndicated loan to ProSieben, offering to purchase €512 million of a €7.2 billion loan.  ProSieben is a leading broadcast company in Germany.  The allocation Pickett requested was two to three times the total net asset value of the Fund.  Upon information and belief, Pickett did not provide a copy of the Indication of Interest to the back office of CPL or to CAI, as is required by CAI operating procedures and regulations.

37.     Upon information and belief, Pickett did not enter the trade in a pipeline report showing the timing and amount of the transactions in process and investments on the books that would be maturing, sold or disposed of otherwise.

38.     Upon information and belief, the MLAs of the ProSieben loan promptly sent a confirmation of the Indication of Interest to CPL.  Upon information and belief, the back office of CPL and the risk managers of CAI failed to record the confirmation as a result of a lack of internal controls.

39.     Upon information and belief, the ProSieben order exceeded Citigroup's internal trading limits on leverage as set forth in the Master Investment Management Agreement between CPL and the Fund.

40.     Upon information and belief, the MLAs allocated €512 million of debt to the Fund and notified CPL of this allocation on June 29, 2007.  Upon information and belief, this development was not recorded on the books and records of the Fund.

41.     Upon information and belief, Pickett unilaterally refused to honor the allocation notice because allegedly the MLAs had materially changed the terms of the transaction.

42.     Upon information and belief, the MLAs complained to John Havens, president and CEO of CAI (since April 2007), about Pickett's attempted withdrawal from the transaction.

43.     Upon information and belief, from mid-summer 2007 until December 2007, Defendants secretly negotiated with the MLAs to settle the dispute over the ProSieben investment. Defendants did not notify the Fund's investors, including Plaintiff, of the existence of the dispute or the ProSieben transaction until December 2007.

44.     Upon information and belief, the Fund's exposure report as of October 31, 2007 omitted the ProSieben investment and falsely represented that the Fund's leverage declined to 5.36 times net asset value. HDL did not receive a copy of this report, but upon information and belief, other investors did.

45.     At no point in time from June 2007 until December 2007 did CAI, CPL or the Fund notify Plaintiff or, upon information and belief, other investors, of the ProSieben investment and in fact, purposefully concealed its existence from Plaintiff and other investors.

46.     Upon information and belief, during the summer, fall and early winter of 2007 at least one other investor in the Fund engaged in continuing conversations with CAI and CPL representatives who affirmatively misrepresented the financial well-being of the Fund and concealed the existence of the ProSieben investment and its effect on the Fund.

47.     Upon information and belief, Citigroup, as an investor in the Fund, knew of the ProSieben investment and the dispute that arose during the summer of 2007.

48.     Had HDL learned of the ProSieben investment at any point from the time the investment was initiated to the time it was revealed to investors, HDL would have sought to rescind its subscription in the Fund because the investment was inconsistent with the Fund's investment strategy as represented in all of the Fund's marketing materials, including the PPM

11

and the Booklet and because the investment violated the Master Investment Management Agreement.

### E.   Investors Learn of the ProSieben Investment

49.   On December 14, 2007, CPL sent a letter to all of the Fund's investors, on CAI letterhead, notifying them that the Master Fund

> has been involved in a dispute with Managing Lead Arrangers (MLAs) in connection with a syndicated loan. . . . The settlement will result in the [Fund] purchasing loans with an aggregate principal amount of €512 million. The loans will be purchased at par or 100. However, because the loans are currently valued at levels that are approximately between 86 and 93 percent of par (depending on the tranche), the effect on the [Fund's] net asset value, and consequently the value of your investment, will be material. . . . Based on the mark-to-market value of the loans as of November 30, 2007, the [Fund] will take a reserve of US$ 62.4 million resulting in a net asset value of US$548 million.

50.   The same letter also stated that the "[Fund] is down 12.6% on a gross basis. Of this decline in value, 10% is attributable to the reserve and 2.6% represents the gross portfolio loss in November 2007." The letter also stated that "the quality of the [Fund's] portfolio is fundamentally sound," that Citigroup is willing to increase its investment by a further $50 million subject to tax issues, and that it is waving fees until November 2008. The representations in this letter were misleading because the Fund was not fundamentally sound in light of the large amount of leverage necessary to acquire the ProSieben loans.

51.   The December 14, 2007 letter also notified investors that Pickett had resigned.

52.   The letter was signed by Michael Micko, Pickett's replacement, on behalf of CPL.

53.   Additionally, the letter notified investors that Micko would report to Jonathan Dorfman, co-head of CAI Global Fixed Income. The letter explained that CAI had "recently created a Global Fixed Income group under Jonathan Dorfman and James O'Brien, which will greatly enhance the credit markets expertise of the firm in general and the [Fund] in particular."

54.     The letter also notified the Fund's investors that Pickett's departure constituted a "Key Man Event," which allowed investors to redeem "Key Man Event redemption shares." The letter, however, discouraged investors from redeeming their shares and stated that "the Investment Manager believes that the quality of the [Fund's] overall portfolio is fundamentally sound and the return profile from current market levels could be very attractive from an 18 to 24 month forward looking perspective."

55.     At no point, from the time that Pickett expressed interest in participating in the ProSieben transaction, was Plaintiff notified of this potential investment which implicated more than two times the net asset value of the Fund.

56.     The Fund suspended redemptions a little over a month later, on January 25, 2008, and instituted a compulsory redemption of shares on December 22, 2008.

57.     On December 17, 2007, Mr. Slapp contacted Sarah O'Brien ("O'Brien"), the private banker at the Citigroup Private Bank who had introduced him to the Fund. Mr. Slapp wanted to know the details of the ProSieben syndicated loan, including why investors had not been notified until December 14, 2007 about the existence of the loan. Mr. Slapp also inquired into when the purchase happened, how could a fund with a net asset value of about $500 million purchase a loan so large, and how leveraged was the Fund.

58.     On December 19, 2007, the shareholders of the Fund were officially notified that Pickett's resignation had triggered a "Key Man Event" and that shareholders had the option of redeeming shares categorized as "KME Redemption Shares." Investors were given a 90 day period during which they could elect to redeem their Key Man shares. HDL did not get a chance to make the redemption election, however, because on January 25, 2008 all redemptions were suspended.

59.     Also, on December 19, 2007, Mr. Slapp spoke by telephone with Ramesh Parameswar, a CAI investment relations officer located in New York.  Parameswar was not able to explain why the transaction had been kept off the books until December 2007, or why investors had not been notified of the transaction until December 14, 2007.  Mr. Slapp learned that ProSieben transaction had increased the leverage of the fund from 5.4 to 6.9 and that the trade had been the subject of a legal dispute since the end of June 2007.  He also was told that approximately $40 million in redemptions were made before the ProSieben trade was disclosed to the investors.

60.     Mr. Slapp was very surprised to learn that the leverage of the Fund before the ProSieben transaction was 5.4 and that the fund was unhedged.

61.     Following his conversation with Parameswar, on December 20, 2009, Mr. Slapp sent an e-mail to O'Brien, asking her to forward some follow up questions to Parameswar.  Mr. Slapp did not receive a satisfactory response.

62.     On January 3, 2008, Mr. Slapp sent a letter to O'Brien requesting a refund of his investment amount.  Mr. Slapp reiterated that he was "shocked to find out the fund is leveraged 6.9 times long and un-hedged during this credit crisis."

63.     On January 23, 2008, CPL issued a performance report for the Fund that for the first time named the top positions held by the Fund and indicated its leverage.  The report indicated that the top seven positions totaled 3.5 times the net asset value of the Fund, that the Fund was unhedged and that its leverage was 7.58.

64.     On January 25, 2008, all of the Fund's investors were notified by letter that "redemptions of all shares have been temporarily suspended until such time as the boards resolve otherwise."  The letter also noted that "[w]hile the Investment Manager continues to believe in

14

the inherently good quality of the Master Fund's assets, a forced liquidation of the assets coupled with a general lack of activity in the credit markets would result in sale prices not reflective of the assets' true value. . . . The Investment Manager has also been working on a plan to restructure the Master Fund's financing and capitalization to position the fund as best as possible for future growth. . . . For these reasons, the Investment Manager recommended that the boards of the Funds, the Citigroup feeder company, and the Master Fund suspend all redemptions." The letter was signed by Micko on behalf of CPL and was written on CAI letterhead.

65.     On January 31, 2008, the Fund's investors were sent another letter, which notified them that "[a]t the end of day January 31st 2008, the CSO master fund was down 31% MTD on a gross basis. This reflects the performance of the fund and the adjustment to the reserve for the settlement of a syndicated loan trade dispute. We continue to have strong faith in the quality of our underlying positions despite these painful mark-to-market price moves." This letter also was signed by CPL and written on CAI letterhead.

66.     Upon information and belief, in January and February 2008, Citigroup/CAI made equity investments totaling $160 million in the Fund. The terms and conditions of the investments have not been disclosed to Plaintiff.

67.     A February 15, 2008 Wall Street Journal article described the situation as follows:

> Mr. Pickett's big order last June was for several hundred million dollars of leveraged loans that a group of banks was selling in a private auction on behalf of a German media company. . . . At the time, CSO had roughly $700 million in assets, meaning that Mr. Pickett wanted to commit more than half of the hedge fund's assets. . . .
>
> The seven banks running the June auction allocated CSO a bundle of loans with a price tag of more than €500 million ($730 million), say the people involved in the transaction. Mr. Pickett tried to back out, saying the banks in the deal changed the loan terms after he submitted this bid. . . .

Mr. Pickett argued that it was his fiduciary duty to cancel the order. He proposed to Citigroup executives that the fund sue the banks arranging the transaction.

Executives at Morgan Stanley, a lead bank on the loan deal, cried foul. They called Mr. Havens, who was Mr. Pickett's superior and former head of global sale and distribution at Morgan Stanley.

. . . [Mr. Havens] began trying to negotiate a settlement with Morgan Stanley over the deal.

Mr. Pickett responded by accusing Messrs. Havens and O'Brien of ignoring the fund's fiduciary duty and having a potential conflict of interest given their ties to Morgan Stanley. . . .

In early December, Citigroup executives agreed to a settlement proposed by Morgan Stanley. Under the deal, CSO would purchase €512 million (about $746 million) of the loans at face value, even though they were trading for 86% to 93% of their face value. . . .

Had it not purchased the loans and paid the legal costs, CSO would have reported a modest positive return for 2007 – not a 10.9% loss.

(emphasis added).

68.     On February 21, 2008, investors in the Fund were notified that Citigroup intended to restructure the Fund. The restructuring was targeted to allow the Master Fund to: "(i) sell off a substantial portion of its current portfolio to Citigroup, thereby reducing the fund's leverage and allowing the return of collateral posted by the fund to meet obligations under a financing line with its largest financing counterparty; (ii) finance the acquisition by the fund of approximately 65% of the ProSieben assets that were the subject of a now-settled trade dispute, with Citigroup buying the rest; and (iii) provide liquidity to the fund to help meet ongoing collateral obligations under its financing lines." This letter was signed by Micko on behalf of CPL and written on CAI letterhead.

69.     The February 21, 2008 letter noted that "[t]he Investment Manager believes that is imperative to address the Master Fund's high leverage, which has resulted from recent and

unprecedented market dislocation and weakness, as well as the incremental exposure created by the pending settlement of the ProSieben loan positions.

70. The restructuring described in the February 21, 2008 letter was intended to have the following consequences:

> - The Master Fund's leverage is expected to come down to a targeted leverage in the range of 4.5x, based on market prices as of February 8, 2008.
>
> - Following implementation of the restructuring plan, it is expected that no single position held by the Master Fund will represent more that [sic] 15% gross exposure.
>
> - We believe that the overall net asset value of the Master Fund as of February 8, 2008 market prices, assuming the elements of the restructuring plan had been implemented as of that date and all other things remaining equal, would have been $574 million.
>
> - As of February 1, 2008, the fund's management fees have been lowered by 1% to all investors for the Master Fund's fiscal year 2008, and incentive fees have also been waived for the fiscal year 2008 as of that date.

71. On or about February 27, 2008, Citigroup/CAI made an unconditional payment of $159 million to the Fund to compensate investors for market losses in January 2008. Upon information and belief, Defendants settled the ProSieben transaction on or about February 28, 2008. Upon information and belief, Citigroup/CAI purchased at undisclosed "market rates" $800 million of assets from the Fund, as well as approximately $200 million of the ProSieben loans. The details of these transactions have not been disclosed to Plaintiff.

72. Citigroup would not have undertaken such drastic measures, had it not known that Defendants' internal controls had failed, that the Fund's investment strategy had not been followed, and had it not acknowledged the fact that the ProSieben transaction had a material negative effect on the financial condition of the Fund.

73.     On November 18, 2008, the Fund's investors were informed that a forced redemption would occur on November 20, 2008 "for cash at a per share price equal to the net asset value per share to be determined by the fund's administrator as of the Redemption Date." This letter was signed by "CSO Partners Limited, Investment Manager, [f]or itself and on behalf of CSO Ltd., CSO US Ltd., and CSO Citigroup Ltd." Like the majority of communications from the Fund, this letter was written on CAI letterhead.

74.     The Fund's investors received $0.03 for each dollar invested.

75.     HDL recovered $14,922.77 of the $500,000.00 it invested on April 1, 2007.

## COUNT I

### Breach of Fiduciary Duty

76.     Plaintiff incorporates the allegations set forth in Paragraphs 1 through 75 above as if fully set forth herein.

77.     Defendants stood in a fiduciary relationship with Plaintiff by virtue of their position and by virtue of having superior access to confidential information so as to require Plaintiff to repose trust and confidence in them. The fiduciary relationship arose from Plaintiff entrusting assets to Defendants for investment.

78.     All decision-making associated with the Fund was given to Defendants' discretion and direction.

79.     Defendants owed a fiduciary duty to Plaintiff as an investor in the Fund to invest strictly in accordance with the strategy set forth in the PPM, the Booklet and other marketing materials, and in accordance with the investment restrictions and internal trading limits set forth in the Master Investment Management Agreement.

80.     Defendants owed a fiduciary duty to Plaintiff as an investor in the Fund to make full, timely and complete disclosures of all material investments and adverse events in connection with the Fund. CPL owed Plaintiff a fiduciary duty of truthfulness and candor as a registered investment advisor in the United States and in the United Kingdom. Defendants breached this duty by failing to make timely disclosure of the fact that the Fund was highly leveraged, unhedged and that the Fund's trading strategy was not being followed in connection with the ProSieben transaction.

81.     Defendants betrayed their fiduciary duties in connection with the ProSieben investment because that investment violated Defendants' own trading limits and policies.

82. CAI further owed plaintiff a fiduciary duty to exercise vigilance to ensure that CPL and John Pickett invested in accordance with applicable trading limits and practices.

83. Plaintiff suffered damages, in an amount to be determined at trial, as a direct result of Defendants' breaches of fiduciary duty.

## COUNT II

### Professional Negligence

84. Plaintiffs incorporate the allegations set forth in Paragraphs 1 through 83 above as if fully set forth herein.

85. Defendants owed Plaintiff a duty of care to monitor the activities of John Pickett and to ensure that all trades were executed in compliance with internal trading limits and the Fund's trading strategy and objectives detailed in the PPM, the Booklet and other marketing materials.

86. Defendants breached their duty of care to monitor adequately the activities of John Pickett as portfolio manager of the Fund and by failing to have systems in place to capture all intentions of interest, commitments, subscriptions, trades, credit transactions, and all communications with counterparties on the books and record of the Fund and CAI. Defendants also failed to ensure that all trades were executed in compliance with trading limits. Defendants' failures were a departure from accepted standards of practice in the industry.

87. Plaintiff has been damaged as a proximate result of Defendants' negligence in an amount to be determined at trial.

## COUNT III

### Fraudulent Concealment

88.     Plaintiff incorporates the allegations set forth in Paragraphs 1 through 87 above as if fully set forth herein.

89.     A relationship of trust and confidence existed between the parties.

90.     Defendants knew that the ProSieben transaction, which increased the leverage of the Fund to 6.9 times the net asset value of the Fund, violated the internal trading limits set by CAI, the Fund's PPM, and the investment restrictions set forth in the Master Investment Management Agreement.

91.     Defendants chose to proceed with the ProSieben transaction even though John Pickett, the portfolio manager, decided that it was not a good investment.

92.     Defendants failed to record the ProSieben transaction on the Fund's books and records, thereby concealing the existence of the transaction from investors in the Fund.

93.     Defendants' knowledge of the ProSieben investment and its impact on the Fund put them in a unique position, where by virtue of their superior knowledge of material facts, a duty to disclose arose.

94.     Defendants' failure to timely disclose the ProSieben investment to Plaintiff perpetrated a fraud on Plaintiff by inducing him to remain invested in the Fund.  Had Plaintiff known the true facts he would have sought to rescind his investment in the Fund.

95.     Defendants were aware of the material adverse impact that the ProSieben investment would have on the Fund and chose to conceal the ProSieben investment from investors.  Upon information and belief, in at least one instance, Defendants materially

misrepresented the Fund's financial condition to an investor as part of a scheme to conceal the ProSieben investment.

96. Defendants' use of leverage, lack of hedging, general failure to follow the Fund's investment guidelines and the investment restrictions set for in the Master Investment Agreement, and undisclosed investment in ProSieben resulted in the ultimate collapse of the Fund and caused Plaintiff to lose the entirety of its investment.

97. As a result of Defendants' fraudulent concealment of the ProSieben investment, Plaintiff has suffered damages in an amount to be determined at trial.

### Count IV

### Breach of Contract (as against CSO US Ltd. and the Master Fund)

98. Plaintiff incorporates the allegations set forth in Paragraphs 1 through 97 above as if fully set forth herein.

99. Plaintiff signed a subscription agreement with CSO US, which incorporated the terms of the PPM. The PPM provided that all of the shares of CSO US would be invested in the Master Fund.

100. Plaintiff contracted with Defendants that in return for the payment of certain fees, Defendants would invest Plaintiff's money in accordance with the investment strategy set out in the PPM, the Booklet and other marketing materials provided to Plaintiff.

101. Defendants breached their promise to follow a specified investment strategy and implement certain risk management measures by permitting the leverage of the Fund to increase to a dangerous level; failing to record the ProSieben transaction on the Fund's books and records; failing to timely disclose the effect of the ProSieben transaction on the Fund to

investors; and failing to put in place measure to counteract the effect of the excessive leverage on the Fund..

102. As a result of Defendants' breach, Plaintiff lost the almost the entirety of its investment.

## Count V

### Breach of Contract (as against CPL and CAI)

103. Plaintiff incorporates the allegations set forth in Paragraphs 1 through 102 above as if fully set forth herein.

104. Plaintiff was a third-party beneficiary of the Master Investment Agreement entered into between the Fund and CPL. At all times relevant to this complaint, CPL was the alter ego and instrumentality of CAI.

105. The Master Investment Agreement contained certain specific investment guidelines for the Fund and set certain internal trading limits.

106. Defendants breached the terms of the Master Investment Agreement by violating internal trading limits; permitting the leverage of the Fund to increase to a dangerous level; failing to record the ProSieben transaction on the Fund's books and records; failing to timely disclose the effect of the ProSieben transaction on the Fund to investors; and failing to put in place measures to counteract the effect of the excessive leverage on the Fund.

107. As a result of Defendants' breach, Plaintiff lost the almost the entirety of its investment.

## CONCLUSION

WHEREFORE, Plaintiff demands judgment from this Court awarding:

(a)      On Counts I, II, III, IV, and V compensatory damages against all Defendants in an amount not less $500,000;

(b)      Pre-judgment interest in the amount recoverable under New York law;

(c)      Such other and further relief as shall be appropriate.

Dated: October 23, 2009
        New York, New York

           Respectfully submitted,

           LIDDLE & ROBINSON, L.L.P.

           By: _____
                 Jeffrey L. Liddle
                 Ethan A. Brecher
                 Maryana A. Kodner

           800 Third Avenue
           New York, NY 10017
           jliddle@liddlerobinson.com
           ebrecher@liddlerobinson.com
           mkodner@liddlerobinson.com
           (212) 687-8500

           *Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing First Amended Complaint, was served by express and electronic mail on October 23, 2009 upon:

Anthony Candido, Esq.
Clifford Chance US LLP
31 West 52nd Street
New York, NY 10019
anthony.candido@cliffordchance.com
laura.mclaren@cliffordchance.com

Randall Rainer, Esq.
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, NY 10110
rrainer@wmd-law.com
abialek@wmd-law.com

Dated: New York, New York
     October 23, 2009

_____
Ethan A. Brecher